UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT 100008357382574 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | No. 2:23-mj-00091-KFW |

**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Christopher Concannon, being duly deposed and sworn, state as follows:

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I have been a Special Agent with ATF for approximately 17 years. As a Special Agent with ATF, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law. I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. *See* 18 U.S.C. § 3051.

3.      As an ATF Special Agent, I have completed the Criminal Investigator Training Program and ATF Special Agent Basic Training at the Federal Law enforcement Training Center in Glynco, Georgia, where I received training in the investigation of federal crimes involving firearms, narcotics, arson and explosives. I am currently assigned to the ATF Boston Field Division – Portland Field Office.  I have participated in numerous arrest and seizure warrants involving a variety of offenses, including violations pertaining to firearms investigations. I have personally reviewed reports and documentation and have had conversations with employees at the ATF and other law enforcement agencies in regard to the offenses referred to below. I am familiar with the facts and circumstances of this investigation.

4.      During my work with ATF, I have employed a number of investigative techniques, including the use of cellular phone technology, cellular towers, and the analysis of historical cellular phone records for the purpose of determining the approximate location from which a phone was used at the particular time or range of times.

5.      The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents related to this investigation, and information gained through my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code (U.S.C.), Sections 2, 371, 922(a)(6), 924(a)(1)(A), 922(x)(1) and 922(x)(2) have been committed by

Joshua VACHON and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8. On April 6, 2023, I reviewed Firearms Trace Summary Report #T20210520335. The trace summary report documented that Joshua VACHON purchased a Smith & Wesson, model SD40VE, .40 caliber pistol, serial number FDL9289, at 3 Cousins Firearms, a Federal Firearms Licensee (FFL), in Lewiston, ME, on September 23, 2021, which was recovered from Juvenile 1 in Lewiston, ME, on November 23, 2021.

9. On the same date, I learned of an association between VACHON and Juvenile 1 documented in Lewiston Police Department records.

10. In addition to the traced firearm, I learned that VACHON purchased four pistols at Coastal Trading & Pawn, an FFL, located in Auburn, ME, between October 17, 2022, and January 2, 2023.

11. On April 10, 2023, I telephonically contacted VACHON. I introduced myself to VACHON and asked VACHON if he would be willing to speak with me regarding a firearm that he purchased which had been recovered by law enforcement. VACHON agreed to meet me at the Oxford, ME Hannaford supermarket parking lot later that date.

12. On the same date, ATF Special Agent Christopher Durkin (SA Durkin) and I traveled to the meeting location and made contact with VACHON. VACHON entered my government-owned vehicle. I recorded the contact with VACHON[1]. I introduced myself and SA Durkin to VACHON and showed him my credentials. I told VACHON that the vehicle doors were unlocked. I advised VACHON that he was free to leave at any time. I advised VACHON that he was not under arrest, was not in custody and was not being detained.

13. I referenced our telephonic contact earlier that date. I told VACHON that a firearm he purchased had been recovered by law enforcement.

14. VACHON did not recall how many firearms he had purchased. VACHON said he did not have any firearms in his possession and did not know where there were. VACHON thought that he had misplaced the firearms. Aside from recalling that they were all handguns, VACHON could not provide any further details relating to any of the firearms.

15. I showed VACHON a copy of the ATF Form 4473, documenting his purchase of the following firearm at 3 Cousins firearms:

   1) September 23, 2021 – Smith & Wesson, model SD40VE, .40 caliber pistol, serial number FDL9289.

16. VACHON acknowledged that the form contained his information. VACHON told me that he had misplaced the firearm.

17. I advised VACHON that the firearm had been recovered from Juvenile 1 in November of 2021. I asked VACHON if he knew Juvenile 1[2]. VACHON acknowledged that he

---

[1] I told VACHON that I was recording the contact. The information contained in this affidavit relating to our contact is not intended to be a verbatim or transcribed account of the contact.

[2] VACHON knew Juvenile 1 by first and last name. VACHON was aware that Juvenile 1 was younger than him. I asked VACHON if he knew how old Juvenile 1 was and he responded negatively. VACHON denied that Juvenile 1 ever told him his age.

did. VACHON said he met Juvenile 1 around Lewiston, ME and added that they hung out and smoked marijuana together. VACHON could not provide an explanation as to how Juvenile 1 ended up with the firearm. VACHON maintained that he did not provide Juvenile 1 the firearm. VACHON denied that Juvenile 1 requested him to purchase the firearm.

18. I showed VACHON copies of the ATF Forms 4473, documenting the following of his purchases from Coastal Trading & Pawn, an FFL, in Auburn, ME:

1) October 17, 2022 – Smith & Wesson, model Bodyguard, .380 caliber pistol, serial number KEE9590
2) November 17, 2022 – American Tactical, model FXS-9, 9mm pistol, serial number TF674-21A04604
3) December 10, 2022 – Bear Creek Arsenal, model BCA15, 5.56 mm pistol, serial number 52333
4) January 2, 2023 – Charter Arms, model 53845, .38 caliber revolver, serial number 22L27494

19. VACHON acknowledged that each ATF Form 4473 contained his information. VACHON indicated that he misplaced each of the firearms that he purchased. VACHON denied that anyone requested him to purchase the firearms.

20. I told VACHON that I was concerned that he was not being truthful. I explained to VACHON that providing false information to a federal agent is something that he could be charged with. VACHON maintained that he was being truthful.

21. VACHON indicated that he was nervous and overwhelmed[3].

22. Approximately 38:35 into the contact, VACHON indicated that he had not been truthful.

---

[3] VACHON referenced experiencing stressors in his life that effect his memory. VACHON indicated that his stressors included being abused by his ex-girlfriend, as well as his current living situation. Additionally, VACHON told me that when he is nervous, he tends to "not be completely honest".

23. VACHON told me the following relating to his purchase of the Smith & Wesson, model SD40VE, .40 caliber pistol, serial number FDL9289, on September 23, 2021.

- Juvenile 1 asked him to purchase the firearm for him.
- Juvenile 1 provided him the money to purchase the firearm.
- Juvenile 1 traveled to the store with him.
- He provided Juvenile 1 the firearm after he purchased it.
- Juvenile 1 provided him cash in exchange for purchasing the firearm for Juvenile 1.

24. I asked VACHON about the four pistols that he purchased at Coastal Trading & Pawn between October 17, 2022, and January 2, 2023.

25. VACHON indicated that he purchased the firearms on behalf of two individuals, that he thought were brothers. VACHON knew their first names and provided general descriptions of each. VACHON thought they might have been friends with Juvenile 1. VACHON explained that he did not believe either individual was old enough to purchase pistols. VACHON did not think they were "18" or "21". VACHON thought their age was the reason they asked him to purchase the firearms for them.

26. VACHON acknowledged the following relating to the four firearms that he purchased for them:

- They reached out to him on Facebook Messenger prior to each purchase.
- They picked him up and brought him to the FFL.
- On at least one occasion they entered the store with him.
- They provided him the money to purchase each firearm.
- Each firearm went directly to them after VACHON's purchase.

- He was provided a ride back to Oxford after each purchase.
- They provided him $80 for each firearm purchased.

27. VACHON indicated that he communicated with the individuals on Facebook Messenger.

28. VACHON agreed to show me his messages with one of the individuals, whose Facebook Account he identified as "Yung Savage". VACHON explained that the entire exchange was not visible because he was not connected to Wi-Fi. VACHON indicated that he could show me the entire exchange if he was connected to Wi-Fi. VACHON referenced that the date of the exchange was February 20, 2023. VACHON agreed to let SA Concannon photo document the account name and the exchange. The photos appear below.



29. I referenced VACHON's exchange with "Yung Savage", and that VACHON stated "I'm not comfortable with getting another one piece unless we can do a bill of sale". I asked VACHON what he was referring to. VACHON indicated that he was referring to a bill of

sale for the firearm. I referenced that VACHON also stated "I could possibly do it tomorrow afternoon". VACHON denied that he purchased a firearm the following date as indicated in the message.

30. VACHON was not sure if he had any Facebook Messenger messages with the other individual that he could access without Wi-Fi. VACHON looked through his phone and indicated that he did not locate any messages. VACHON indicated that the other individual's Facebook Account had a similar sounding name to "Yung Savage". VACHON recalled that the individual's account was "Yung", followed by something.

31. VACHON thought Juvenile 1's Facebook Account was "Yung Blu". VACHON showed me a message from "Yung Blu" on February 25, 2023. VACHON allowed me to photo document the message. The photo appears below.



32. VACHON showed me his Facebook Account. VACHON allowed me to photo document his account. The photos appear below.



33. I determined that the Facebook User ID for VACHON's account was 100008357382574. I submitted a preservation request for the account on April 11, 2023.

## BACKGROUND CONCERNING FACEBOOK[4]

34. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com, and is a provider of electronic communications services and remote computing services as defined by 18 U.S.C. §§ 2711(2) and 3127(1). Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

35. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a unique user identification number and can choose a username.

36. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account

---

[4] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; https://www.facebook.com/about/basics/manage-your-privacy/location ("Location"); https://www.facebook.com/help/278928889350358 ("How Location Settings Work"); and https://www.facebook.com/help ("Help Center"); and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

37. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

38. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

39. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

40. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

41. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

42. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

43. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

44. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

45. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

46. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that

application may appear on the user's profile page. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

47. Meta uses information about the location of its Facebook users for business purposes and to enhance the functionality of its platform, such as to personalize and target advertisements, display local news stories, suggest nearby events, and detect suspicious account activity. Location determinations are informed by connection records, device-based data, and user-generated information. Examples of data used by Meta to determine a user's location include IP addresses, Global Position System ("GPS") data, "check-ins," and event responses. Meta also uses this data to estimate the city or town where the user is situated, which Meta refers to as the user's "Primary Location."

48. Meta collects geolocation data, which it refers to as "precise location information," from a user's device if each of the following conditions are met. First, the Facebook mobile application must be installed on the device. Second, a user of that device must have granted "permission" through the device's operating system for the mobile application to receive and transmit location data to Meta. Third, a user of that device must have enabled "location services" through the device's operating system. Fourth, the mobile application must be logged into a Facebook account and, if required by the permission or other settings, be in active use.

49. This proposed search warrant seeks the historical and prospective production of geolocation information collected and retained by Facebook in the normal course of business. Meta produces geolocation data to law enforcement as datapoints consisting of a latitude,

Case 2:23-mj-00091-KFW   Document 1-1   Filed 04/24/23   Page 13 of 15   PageID #: 14

longitude, and timestamp. According to Meta, it retains only one such datapoint for an account, with each subsequent datapoint replacing the prior. Based on my training and experience, I know that Meta can produce that stored datapoint, which it refers to as "Last Location," and it can also produce subsequent datapoints on a rolling basis. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

50.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as

described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

51.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

52.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

53. Based on the foregoing, I request that the Court issue the proposed search warrant.

54. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

55. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated" 18 U.S.C. § 2711(3)(A)(i).

Christopher Concannon
Special Agent, ATF

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Apr 24 2023

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf,  U.S. Magistrate Judge
Printed name and title

15